IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

NELL FINCH o/b/o                                                                                PLAINTIFF
R. R. W.

      v.                                          CIVIL NO. 07-2072

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                     DEFENDANT

**MEMORANDUM OPINION**

      Plaintiff, Nell Finch, brings this action on behalf of R. R. W., a minor child, seeking judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration (Commissioner), denying R. R. W.'s application for child's supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

**I. Background:**

      Plaintiff filed an application for SSI on R. R. W.'s behalf on August 16, 2005, alleging that R. R. W. became disabled on May 31, 2004, due to attention deficit hyperactivity disorder ("ADHD") and depression. (Tr. 64-72, 103). An administrative hearing was held on September 5, 2006. (Tr. 264-299). Plaintiff was present and represented by council. At the time, R. R. W. was 16 years old and in the eighth grade. (Tr. 267).

      The Administrative Law Judge ("ALJ"), in a written decision dated December 18, 2006, found that R. R. W.'s impairments were severe, but did not meet, medically equal, or functionally equal any of the listed impairments . (Tr. 18). He concluded that R. R. W. had less than marked limitations with regard to acquiring and using information; attending and completing tasks, and interacting and relating with others, and no limitations affecting his ability to move about and

manipulate objects, care for himself, or health and physical well-being. (Tr. 18-22). As such, the ALJ determined that R. R. W. was not disabled. (Tr. 22).

On May 9, 2007, the Appeals Council declined to review this decision. (Tr. 4-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the matter is now ready for decision. (Doc. # 8, 9).

## II. Evidence Presented:

Dr. Jon Hendrickson is R. R.W.'s primary treating physician. He initially saw R.R.W. on January 27, 2003 for complaints of chest and neck pain. (Tr. 202). R. R. W. reported that his symptoms had been occurring off and on for the previous couple of weeks. Dr. Hendrickson's initial impression was of tachycardia, therefore, he scheduled a Holter monitor study in an attempt to capture R. R. W.'s rapid heart rate symptoms." (Tr. 202). Chest x-rays revealed that the heart was within normal size limits and the lungs were clear. (Tr. 200).

Dr. Hendrickson referred R.R.W. to Dr. Thomas Best, a cardiologist. (Tr. 198-199). On April 17, 2003, Dr. Best noted that R.R.W. had been suffering "6-7 months of chest pain that is random throughout the day." (Tr. 198). He stated that "there are no known precipitating or alleviating factors, although he does seem to complain of some pain with exercise." (Tr. 198). R. R. W. reported no episodes of dizziness, seizures or syncope. (Tr. 198). An electrocardiogram demonstrated sinus rhythm with normal intervals, normal axis, and normal voltages. Dr. Best diagnosed R. R. W. with non-cardiac chest pain and a structurally normal heart. (Tr. 199). Chest x-rays were also normal. (Tr. 200). He was of the opinion that R. R. W's chest pain was due to

deconditioning, rather than ischemia. Dr. Best recommended that R. R. W. follow-up with normal, well child care and cardiology visits on an as needed basis. (Tr. 199).

On February 3, 2004, R. R. W. underwent a psychoeducational evaluation through the Fort Smith Public Schools. (Tr. 189-195). His measured intellectual functioning fell in the below average range, and the social/emotional behavior rating scales recorded several areas in the significant to very significant range. (Tr. 193). However, overall, Charlene Fite, the examiner, concluded that R. R. W. did not have a disability. Ms. Fite simply recommended that he be provided with structure for all of his academic activities, considered for remedial help, taught to look for "clue" or "key" words in word problems that indicate mathematical operations, taught to restate math problems in his own words, instructed on how to check his math assignments with a calculator, and provided with additional practice in basic multiplication and division. (Tr. 193-194).

Dr. Hendrickson saw R. R. W. on June 7, 2004, for an ADHD evaluation, after R. R. W. failed the seventh grade. (Tr. 197). He noted that R. R. W. had also completed kindergarten twice. R. R. W. reportedly admitted to experiencing difficulty staying focused and completing work. Dr. Hendrickson diagnosed R. R. W. with ADHD and behavioral problems. (Tr. 197). He then prescribed a trial sample of Adderall. (Tr. 197).

R. R. W. returned to Dr. Hendrickson's office on June 16, 2004 for a follow-up. (Tr. 196). Plaintiff reported that the Adderall had "helped significantly in his behavior and his ability to complete tasks." (Tr. 196). At that time, no adverse side effects had been reported, and R. R. W.'s family was happy with his progress. Dr. Hendrickson diagnosed him with adequately controlled ADHD, and advised him to continue taking the Adderall. (Tr. 196).

In a follow-up examination on August 25, 2004, Dr. Hendrickson reported that plaintiff's ADHD remained stable. (Tr. 236). He continued him on medication and planned a follow-up in four to six months. (Tr. 196).

On September 8, 2004, R. R. W.'s school counselor completed a school questionnaire. (Tr. 85-87). She indicated that his problem making/ keeping friends, concentrating on classwork, working independently or staying on task, completing assignments on time, learning from mistakes, and childish/immature behavior noticeably interfered with his academic or social progress. The counselor stated that R. R. W.'s social functioning was not always appropriate for his age level. She also indicated that although he had problems, R. R.W.'s problems were not "serious." (Tr. 85-87).

On September 24, 2004, Dr. Thomas Smith completed a Childhood Disability Evaluation Form ("CDEF") for the Social Security Administration. (Tr. 204-209). After reviewing R. R. W.'s medical records, Dr. Smith opined that R.R.W.'s impairments were non-severe. (Tr. 204). However, he did not indicate the extent of R.R.W.'s limitations in any of the domains. (Tr. 206-207).

On January 24, 2005, R. R.W. was reportedly earning A's and B's in school. (Tr. 213-214). He was, however, 15 years old and remained in the seventh grade. Records indicate that the plaintiff was satisfied with his behavior and medication. Dr. Hendrickson diagnosed him with stable ADHD once again, and prescribed Adderall. (Tr. 213-214).

Dr. Hendrickson saw R.R.W. for another follow-up examination on March 25, 2005. (Tr. 211). Records indicate that R. R. W. was failing in school. Dr. Hendrickson reiterated his assessment of stable ADHD and continued to prescribe the Adderall. (Tr. 211, 212, 234, 235).

4

Dr. Smith completed a second CDEF on September 21, 2005. (Tr. 216-221). This time, Dr. Smith opined that R.R.W. had an impairment or combination of impairments that was severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 216). He concluded that R.R.W. had a less than marked limitation in his ability to acquire and use information, and no limitations in any of the other domains. (Tr. 218-219).

On September 27, 2005, Delaina Dunn, a counselor at Ramsey Junior High, completed a teacher questionnaire. (Tr. 115-122). She indicated that plaintiff had a slight problem providing organized oral explanations and adequate descriptions, learning new material, organizing his own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, seeking attention appropriately, using language appropriate to the situation and listener, taking care of personal hygiene, and knowing when to ask for help. Ms. Dunn stated that R. R. W. had an obvious problem making and keeping friends. (Tr. 118).

On October 4, 2005, Dr. Hendrickson again reiterated his diagnosis and followed the same treatment plan. (Tr. 232).

On January 11, 2006, Dr. S. Manley, completed a CDEF. (Tr. 222-229). Dr. Manly determined that R. R. W.'s ADHD was severe, but did not meet, medically equal, or functionally equal any of the listings. The doctor concluded that R. R. W.'s impairment would result in no limitations with regard to attending and completing tasks, moving about and manipulating objects, caring for himself, and health and physical well-being. Further, Dr. Manly stated that R. R. W. would have less than marked limitations in the area of acquiring and using information and interacting and relating with others. (Tr. 222-229).

Dr. David Webster, a clinical psychologist at the Western Arkansas Counseling and Guidance Center, has seen R.R.W. since February of 2006. In an Intake Assessment dated February 13, 2006, Dr. Webster stated that R. R. W. was oppositional, had a poor attitude, appeared to be mildly depressed, had a history of ADHD for which he was taking Adderall, and had chronic academic problems. He was 16 years old, but remained in the seventh grade at Ramsey Junior High School. There was no history of suicidal ideation other than transient thoughts and no homicidal ideation, hallucinations, or delusions. (Tr. 259). Dr. Webster noted "no history of drug and alcohol treatment, or drug and alcohol problems." (Tr. 259). He indicated that R. R. W.'s social skills appeared to be very poor, and he appeared to be behind in his social development. (Tr. 260). Dr. Webster diagnosed R. R. W. with depressive disorder, not otherwise specified; academic problems; poor social skills, and a global assessment of functioning score of 55. (Tr. 261).

In progress notes dated February 27, 2006, March 7, 2006, March 14, 2006, and March 28, 2006, Dr. Webster indicated that R .R. W. was no danger to himself or to others. (Tr. 255-258). He stated that R. R. W.'s primary problems were his frequent inability to concentrate on tasks, low energy, and low motivation. (Tr. 255-258). Dr. Webster reported a mild impairment in one or more life areas, including interpersonal relationships and family functioning. (Tr. 255-258). He was of the opinion that R. R. W. was not ready for discharge. (Tr. 255-258). In a progress note dated April of 2006, Dr. Webster again reported a mild impairment related to R. R. W,'s interpersonal relationships and family functioning. (Tr. 242-254). He indicated the need for R. R. W. to participate in one or more social activities with peers per week, to identify and act on one or more ways to express gratitude for a gift from his grandmother, and to increase his social skills and pass into the eighth grade. (Tr. 252,253,254). He again reported that R. R. W. was not ready for

AO72A
(Rev. 8/82)

discharge and scheduled return appointments. (Tr. 252-254).

R.R.W. returned to Dr. Hendrickson on April 18, 2006, for a follow-up on his ADHD. (Tr. 230-231). He told the doctor that he had a girlfriend who also enjoyed video games. She was reportedly good in school and helped him with his homework. Dr. Hendrickson diagnosed R. R. W. with stable ADD without hyperactivity. (Tr. 231). He continued to prescribe Adderall and planned another follow-up in four to six months. (Tr. 231).

In a progress note dated May 10, 2006, Dr. Webster noted a need for R. R. W. to show more gratitude for his grandmother's kindness. (Tr. 251). He again stated that R. R. W. was not ready for discharge, and scheduled a return appointment in three weeks. (Tr. 251).

In June 2006, Dr. Webster indicated that R. R. W. had a mild impairment in one or more life areas, including interpersonal relationships and family functioning. (Tr. 164, 242, 249, 250). R. R. W. reported no social progress, and reported that he was uncomfortable in attempting new social experiences. Dr. Webster also stated that R. R. W. was unable to assess social situations due to his lack of experience. Dr. Webster indicated a need for R. R. W. to engage in one or more social activities per week, to increase his social activities and social interaction with his peers, and to get a job. (Tr. 242, 249, 250). Dr. Webster again opined that R.R.W. was not ready for discharge and scheduled return appointments. (Tr. 242, 249, 250).

R. R. W.'s final semester grade report dated June 2, 2006, for the 2006-2007 school year, reveals that plaintiff obtained a D in language arts, A in keyboarding, B and D in science, D and F in mathematics, B in geography, C in history, and B and A in PE. (Tr. 163).

Progress notes from July of 2006 continued to indicate that R. R. W. had only a mild impairment in one or more life areas, and indicated the need for him to get a job and to submit one

or more job applications per week. (Tr. 239, 240). Initially, R. R. W. reported no progress in these areas. However, on July 11, 2006, he stated that he participated in multiple school activities over the previous week and was embarrassed when a girl was rude to him. This was apparently discouraging to him. (Tr. 239, 240).

In a progress noted dated August 1, 2006, Dr. Webster indicated that he "probed" the frequency of the R.R. W.'s participation in social activities with peers and "reframed"his pattern of using video games as being beneficial to avoid exploring new social skills or testing out fears in social settings. Although he was experiencing difficulty in social situations, R. R. W. appeared to envy peers who were learning social skills that resulted [in] new social involvements. (Tr. 238).

In a progress note dated August 8, 2006, Dr. Webster reported that he had facilitated a discussion concerning R. R. W's motivation to participate in social activities with peers outside of his home. He observed that R. R. W.'s boredom was consequential to his choice to remain at home in his room. (Tr. 237). Dr. Webster reiterated his opinion that R. R. W. continued to be in need of services, and planned a return visit in two weeks. (Tr. 237).

### III. Discussion:

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a

contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe

impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or

10

complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3). The ALJ determined that the facts in this case suggest R. R. W. had "less than marked"[1] limitations in the areas of acquiring and using information, attending and completing tasks, and interacting and relating with others, with no limitations in the remaining three domains. (Tr. 12-13).

First, the ALJ found that R. R. W. has less than marked limitations with regard to acquiring and using information. (Tr. 18). Although R. R. W. had a below average I. Q. and had failed the seventh grade on at least two occasions, the majority of the records indicate that his academic problems were due to a lack of motivation, rather than learning problems. (Tr. 112, 115, 125). On January 21, 2003, records from Community Counseling Services, Inc., (CCSI) showed that R. R. W.'s thought processes were logical and responsive; his thought content was appropriate; and, his memory was intact. (Tr. 123). Standardized tests revealed near grade level performance in most areas of study and testing performed by the school counselor showed no evidence of a learning disability. (Tr. 189-195). His final semester grade report dated June 2, 2006, for the 2006-2007 school year reveals that R. R. W. obtained a D in language arts, A in keyboarding, B and D in science, D and F in mathematics, B in geography, C in history, and B and A in PE. (Tr. 163). In fact, Dr. Webster, plaintiff's own treating psychologist, even completed a childhood disability assessment

---

[1] We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F. R. § 416.926a(e).

indicating that plaintiff's ability to acquire and use information was less than marked. Therefore, while there were some areas of academics in which R. R. W. needed additional assistance, we find substantial evidence to support the ALJ's determination that R. R. W. has a less than marked limitation in the "acquiring and using information" domain.

With regard to attending and completing tasks, the ALJ found R. R. W. has less than marked limitations in this area as well. (Tr. 19). The record reveals that R. R. W. is on medication to treat his ADHD. However, progress records from Dr. Hendrickson's office show that R. R. W.'s ADHD and related behavioral problems improved with medication. Ms. Dunn also indicated that R. R. W. performed well in school, and had forgotten to turn in an assignment on a few occasions. (Tr. 117). She stated that he was able to pay attention when spoke to, focus long enough to finish assigned activities or tasks, refocus on tasks when necessary, carry out single-step instructions, carry out multi-sept instructions, wait to take turns, change from one activity to another without being disruptive, work without distracting others, and work at a reasonable pace. Ms. Dunn concluded that R. R. W. had only a slight problem with organizing his own things, completing class/homework assignments, and completing work accurately without careless mistakes. Further, Dr. Webster also indicated that plaintiff had less than marked limitations in this domain of functioning. Therefore, the ALJ's determination will stand.

The ALJ also found R. R. W. has less than marked limitations with regard to interacting and relating with others. (Tr. 20). While we note Ms. Dunn's notation that R. R. W. has an obvious problem making and keeping friends, we are also aware that R. R. W. told Dr. Webster that he had a girlfriend. Records from Dr. Webster also reveal that R. R. W. had begun to have more social interaction and to participate in more social activities. In fact, Dr. Webster even assessed R. R. W.

12

with a less than marked limitation in this area.  Accordingly, we find that substantial evidence supports the ALJ's determination.

With regard to moving about and manipulating objects, the ALJ found R. R. W. has no limitations.  (Tr. 17).  There is no evidence to suggest difficulties in this area of functioning. Therefore, based on this lack of evidence, we conclude that the ALJ properly determined that R. R. W. has no limitations with regard to his ability to move about and manipulate objects.

In addition, the ALJ found that R. R. W. has no limitation in his ability to care for himself. (Tr. 22).  Although Ms. Dunn indicated that R. R. W.'s personal hygiene could be improved, he was reportedly able to care for his physical needs.  (Tr. 120).  R. R. W.'s grandmother also indicated that R. R. W. was able to maintain his person hygiene, use silverware,  pick up and put away his toys, hang up his clothes, help around the house, obey safety rules, and get to school on time.  (Tr. 61). As Dr. Webster was also unable to discern any limitations in this area of functioning, we will uphold the ALJ's finding.

Finally, with regard to health and physical well-being, the ALJ found R. R. W. has no limitations.  (Tr. 22).  Here again, plaintiff has failed to present any evidence to indicate any impairments in this area of functioning.  The record shows that R. R. W.'s ADHD was controllable with medication.  No medication side effects were ever reported, and there is no evidence that R. R. W. was suicidal or likely to harm himself or others.  Ms. Dunn found that R. R. W. could handle frustration, be patient when necessary, cooperate in or be responsible for taking needed medications, use good judgment regarding personal safety and dangerous circumstances, identify and appropriately assert emotional needs, respond appropriately to changes in his own mood, and use appropriate coping skills to meet the daily demands of his school environment.  Therefore, substantial evidence

supports the ALJ's finding that R. R. W. has no limitations in the area of heath and physical well-being.

### III. Conclusion:

Based on the forgoing, we find there is substantial evidence to support the ALJ's determinations with respect to the six domains. Accordingly, we conclude there is substantial evidence supporting the ALJ's determination that R. R. W.'s impairments do not medically or functionally equal any listed impairment.

DATED this 1st day of April 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE